IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENT W. FOWLER, CODY FOWLER, LARRY BURRIS, MICHAEL LEACH, FRANCES WOODS, ROSEOLA THORNBURG, KATHERINE CARROLL, BETTIE BURNETT, LISA SMITH, ALICE SMITH, LESA HORNEY, CHRISTINE LANE-HUCKABAY, KENYA WASHINGTON, YOLANDA WHITE, ANGELA MCVAY, WAKEETHA ATKESON, ANGIE MILLER, RUBY MCGEE, CARMEN KIRKLAND, ANNTONETT TAYLOR, DELORIS WILSON, TIA SALLIS, SHERRY SALLIS, BRUCE MCCARTHY, NICOLE PIERCE, CYNTHIA WHITEFIELD, JORETTA TRUITT, JUDY BLACKMER, LAJOYA DAVIS, LECEIF SPRING, MISTY GRAHAM, SONYA JULY and STEPHANIE NEWMAN, Individually and standing in the stead of other persons similarly situated, | |
| Plaintiffs, | |
| vs. | Case No. CIV-03-321-RAW |
| INCOR, SHELTERED WORK ACTIVITY PROGRAM, INC., an Oklahoma Corporation, d/b/a INCOR, EDWARD BREEN, BETSY BREEN, | |
| Defendants. | |

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

This matter originally came on for non-jury trial on December 6-10, 2004. This court

entered Findings of Fact and Conclusions of Law on September 23, 2005. On appeal, the United

States Court of Appeals for the Tenth Circuit vacated those findings and conclusions. *See Fowler*

*v. Incor,* 2008 WL 2019598 (10th Cir.), *cert. denied,* 129 S.Ct. 499 (2008). In addition, the appellate

court affirmed this court's order applying a two-year statute of limitations to the plaintiffs' claims while reversing this court's order granting summary judgment against plaintiffs' claim for liquidated damages.  *Id.*  After remand, this court conducted an additional evidentiary hearing on August 28, 2008. Having considered the record as a whole[1], the court again enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a) F.R.Cv.P.

## I. <u>STATEMENT OF THE CASE</u>

This court adopts the opening passage of the Tenth Circuit opinion: "[Defendant] Incor is in the business of providing services to developmentally disabled adults in northeastern Oklahoma, including operation of a residential program.  Its residential-program employees work as habilitation training specialists and/or house managers, responsible for round-the-clock care of Incor's clients, most of whom have physical disabilities and function at mental levels ranging from a one-year to six-year-old.  The employees sue[] for unpaid wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (FLSA)."  *Id*[2].

Incor contends it is exempt from paying overtime to plaintiffs under the "companionship services" exemption found in 29 U.S.C. §213(a)(15), which exempts payment of overtime wages to employees who provide "companionship services" for individuals who are unable to care for themselves.

---

[1]At the time the court writes, there is no transcript of the August 28, 2008 hearing.   The court has listened to a sound recording of that hearing.

[2]This case is one of many actions resulting from a class action lawsuit which ultimately concluded in a consent decree closing a state-run institution for developmentally disabled individuals and placing those individuals in residences.  Services were to be provided for which the State of Oklahoma paid either directly or indirectly.  *See Johnston v. Volunteers of America, Inc.,* 213 F.3d 559, 565-66 (10th Cir.2000).

Plaintiffs assert Incor is not able to take advantage of the "companionship services" exemption because it does not meet the requirement that services be performed in a "private home" and because plaintiffs spend more than 20% of their time performing general household work unrelated or incidental to the care of the clients.

The FLSA requires employers to pay their employees at a rate of one and one half times their regularly hourly rate for all hours worked in excess of 40 hours per work week.  29 U.S.C. §207(a)(1).  The "companionship services" exemption is an exemption to FLSA overtime pay requirements for "any employee employed in domestic service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary [of Labor])." 29 U.S.C. §213(a)(15).  Congress created the "companionship services" exemption to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them.  *Welding v. BIOS Corp.,* 353 F.3d 1214, 1217 (10th Cir.2004).  The court is required to construe FLSA exemptions narrowly.  *Ackerman v. Coca-Cola Enters., Inc.,* 179 F.3d 1260, 1264 (10th Cir.1999).   Incor bears the burden of proving its employees fit "plainly and unmistakenly within [the exemption's] terms."  *Id.*

There are two key components to the exemption.  The employment must be "domestic service employment," and the services provided must be "companionship services" as those terms are defined by the applicable regulations.  "Domestic service employment" is defined as "services of a household nature performed by an employee in or about a private home (permanent or temporary) of the person by whom he or she is employed."  29 C.F.R. §552.3 (emphasis added). The employee need not be employed directly by the person receiving the services or by that person's

3

family for the exemption to apply.  The exemption can apply even when the employee is actually employed by a service agency, such as Incor.  *See* 29 C.F.R. §552.109(a); *Long Island Care at Home, Ltd. v. Coke,* 127 S.Ct. 2339 (2007).  As pertinent to this case, the question of whether plaintiffs provide "companionship services" revolves around the amount of time each employee spends engaged in "general household work."  The relevant regulation, 29 C.F.R. §552.6, provides in relevant part:

> [T]he term companionship services shall mean those services which provide fellowship, care, and protection for a person who, because of advanced age or physical or mental infirmity, cannot care for his or her own needs.  Such services may include household work related to the care of the aged or infirm person such as meal preparation, bed making, washing of clothes, and other similar services.  They may also include the performance of general household work: *Provided, however,* That such work is incidental, i.e., does not exceed 20 percent of the total weekly hours worked.

(Italics in original).

The question of whether a client's residence falls within the private home exception is a fact-intensive inquiry to be undertaken on a unit-by-unit basis, and no single factor is dispositive.  *Welding*, 353 F.3d at 1218.  The key inquiries are "who has ultimate management control of the unit and whether the living unit is maintained primarily to facilitate the provision of assistive services."  *Id.* at 1219.  The court will consider and render findings as to the "private home" issue first.  This seems a logical approach, because if the court determines that a particular unit is not a private home, then overtime hours worked at that unit are compensable, and the court need not address the "20% rule" as to that unit.  *See Johnston v. Volunteers of America, Inc.,* 213 F.3d 559, 566 (10th Cir.2000)(certain employees entitled to overtime because they were not working in private homes).

4

The following factors are "most pertinent to the key inquiry." *Id.* First, where did the client live before beginning to receive services? Second, who owns the living unit? Ownership by the service provider is a strong indication the home is not a private one. Ownership by the client or the client's family is an indication the home is a private one. A leased unit is more ambiguous. Third, who manages and maintains the residence? That is, who pays the mortgage or rent, utilities and provides food and clothing? Fourth, would the client be allowed to live in the unit if the client were not contracting with the provider? Fifth, what is the relative difference in the cost of the services and the total cost of maintaining the living unit? Sixth, does the service provider use any part of the residence for its own business purposes? Welding, 353 F.3d at 1219-1220.

This court has subject matter jurisdiction over this action. 28 U.S.C. §1331; 29 U.S.C. §216(b). Venue is appropriate in this district. 28 U.S.C. §1391(b).

## II. LIQUIDATED DAMAGES

The mandate rule requires a district court to comply strictly with the mandate rendered by the reviewing court. *Huffman v. Saul Holdings Ltd. Partnership,* 262 F.3d 1128, 1132 (10th Cir.2001). "The mandate consists of our instructions to the district court at the conclusion of the opinion, and the entire opinion that preceded those instructions." *Procter & Gamble Co. v. Haugen,* 317 F.3d 1121, 1126 (10th Cir.2003).

By order (#320) entered July 8, 2004, this court granted the defendants' motion for partial summary judgment as to statute of limitations and liquidated damages. As previously noted, the Tenth Circuit affirmed the former ruling and reversed the latter. In remanding, the appellate court stated: "If the issue cannot be resolved on summary judgment, the court is directed to conduct a hearing to determine whether liquidated damages are appropriate." This court on remand denied

5

that portion of the motion for summary judgment and determined that a hearing would be conducted. A portion of the August 28, 2008 hearing served that purpose.

The mandate in this case sets forth the following governing standards: "Ordinarily, an employer who violates FLSA is liable for both unpaid wages and an additional equal amount as liquidated damages.  29 U.S.C. §216(b).  To avoid such damages, the employer must show 'to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA].' 29 U.S.C. §260.  Good faith is a subjective test that requires 'the employer have an honest intention to ascertain and follow the dictates of [the FLSA].'  *Dep't of Labor v. City of Sapulpa*, 30 F.3d 1285, 1289 (10th Cir.1994) (quotation omitted).  Reasonableness 'imposes an objective standard by which to judge the employer's behavior.'  Only in those instances where the court finds that the employer meets this burden, it may, 'in its sound discretion,' deny liquidated damages.  *Pabst v. Okla. Gas & Elec. Co.,* 228 F.3d 1128, 1136 (10th Cir.2000); *see also City of Sapulpa,* 30 F.3d at 1289 (holding that even if the trial court finds that the employer acted in good faith and reasonably, it may still award liquidated damages)."

The employer's burden is a difficult one, with double damages the norm and single damages the exception.  *See Chao v. Barbeque Ventures, LLC,* 547 F.3d 938, 941-42 (8th Cir.2008).  In other words, liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.  *Jordan v. United States Postal Serv.,* 379 F.3d1196, 1202 (10th Cir.2004)[3].

---

[3]An award of liquidated damages precludes an award of prejudgment interest.  *See City of Sapulpa,* 30 F.3d at 1290.

At the conclusion of the August 28, 2008 hearing, the court stated that it was persuaded defendants had met their burden of proof as to subjective good faith, but that the court was taking under advisement the issue of reasonableness.   Proof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is conformity with the Act, even though his belief is erroneous.   *Bull v. United States,* 68 Fed. Cl. 212, 229 (2005).  To satisfy the objective standard, the employer must act as a reasonably prudent person would have acted under the same circumstances.   *Brooks v. Village of Ridgefield Park,* 185 F.3d 130, 137 (3d Cir.1999).  The Tenth Circuit has stated that reliance on attorneys or other experts in personnel matters have been found particularly persuasive in holding FLSA violations reasonable.   *See Pabst,* 228 F.3d at 1136[4].

## FINDINGS OF FACT– LIQUIDATED DAMAGES

1.     Edward Breen, the president and CEO of Incor, attended a conference in Tulsa, Oklahoma in 1993.  The speaker was Joni Fritz, the executive director of the American Network of Community Options and Resources (ANCOR). (August 28, 2008 hearing)

2.     Mr. Breen believed the meeting was called by the State of Oklahoma, specifically the Developmental Disabilities Services Division (DDSD) of the Oklahoma Department of Human Services.  (*Id*.)

---

[4]During the August 28, 2008 hearing, there were scattered references to the term "willfulness," but at this stage of a proceeding that term only has a bearing on the issue of liquidated damages if a finding of willfulness has already been made regarding the issue of whether the plaintiffs brought their claim within the applicable statute of limitations.   *See Brinkman v. Dep't of Corrections,* 21 F.3d 370, 372-73 (10th Cir.1994); *Zachary v. Rescare Oklahoma, Inc.,* 471 F.Supp.2d 1183, 1193 n.10 (N.D.Okla.2006).  In the case at bar, this court has ruled (and the Tenth Circuit affirmed) that plaintiffs failed to prove willfulness on defendants' part.

3.  At the meeting, Mr. Breen heard for the first time about the availability of the companionship exemption.  He believed Ms. Fritz was brought in by the State of Oklahoma to advise agencies of the exemption.  (*Id*.)

4.  Based upon the presentation, Mr. Breen formed the impression that the State of Oklahoma was endorsing Fritz's views and that the State of Oklahoma was encouraging use of the exemption.  (*Id*.)

5.  At a later time, Mr. Breen had a second meeting with Ms. Fritz at the home of Nina Honeyman, described by Mr. Breen as the director of Gatesway.  Mr. Breen concluded that Ms. Fritz was being presented as an expert and that the State of Oklahoma was encouraging the use of the companionship exemption.  (*Id*.)

6.  Mr. Breen also spoke to Steven Voss, an employee of the United States Department of Labor and William Smith (Voss's supervisor) and was essentially advised that the DOL was treating HTSs as companions for purposes of the exemption.   Mr. Breen wrote a memo dated June 28, 1993 (Defendants' Exhibit 61) memorializing the conversation with Voss.  (*Id*.)

7.  Mr. Breen was made aware that United Cerebral Palsy (UCP) in Ohio had lost litigation over the companionship exemption, but Mr. Breen understood that UCP <u>owned</u> the homes involved, thus distinguishing that result.  (*Id*.)

8.  During the period 1991-93, the DOL investigated BIOS, a service provider in Oklahoma.  In a document titled "WHISARD Compliance Action Report", the DOL stated under "Conclusions & Recommendations" that BIOS was under contract with the state of provide

care for clients released from Hissom and "13A15 Companion Services Applicable". (Defendants' Exhibit 60).  (*Id.*)

9.      BIOS and Volunteers of America (VOA) were agencies larger than Incor, and Mr. Breen had been told that the two were not paying overtime by invoking the companionship exemption. (*Id.*)

10.     Mr. Breen tried to "stay current" on the issue by reading material provided by ANCOR and others, and by talking to colleagues in the field.  He saw no reason to believe Incor was out of compliance, either as to the companionship exemption or as to the "training time" issue. Mrs. Breen (Director of Operations) also attempted to stay current on the training time issue. (*Id.*)

11.     Mr. Breen was made aware that VOA had lost in litigation over the companionship services exemption.  He was told by VOA attorneys that VOA rented the apartments and houses itself, and then assigned the living quarters to the clients.  Mr. Breen viewed this practice as "the kiss of death" and remained confident in Incor's position because he knew this was not Incor's practice.   He was also made aware of the agency Home of Hope prevailing in litigation on the issue, although he did not know many details of that lawsuit.  (*Id.*)

12.     Mr. Breen was informed that other agencies of his type were still employing the companionship services exemption until 2003, the year the present litigation commenced. (*Id.*)

13.    Mr. Breen never consulted an attorney or an auditor regarding the use of the exemption[5].
       (*Id*.)

14.    Betsy Breen also attended a conference in the early 90s and received information, including
       pages 0091-0092 in Defendant's Exhibit 40.   The heading of page 0091 is "<u>STAFF NEED
       NOT BE COMPENSATED FOR STATE-MANDATED TRAINING</u>".   The third paragraph
       states in part that "the 'voluntariness' requirement set out in section 785.27(b) is met <u>where
       the State rather than the employer imposes the training requirement</u>."   Page 0092 states that
       (1) the voluntariness requirement and (2) the requirement of relationship to the employee's
       job provisions are waived if the three elements are met of (a) state-mandated completion of
       training, (b) training occurs outside an employee's regular working hours and (c) no
       productive work performed.   Mrs. Breen testified that she was satisfied based upon this
       information that Incor need not compensate for training time.  (*Id*.)

15.    Mrs. Breen also testified to similar reliance upon pages 0121-0122 of Defendant's Exhibit
       40.   For example, the last full paragraph of page 0121 states in part that where a State
       requires individuals to take training as a condition of employment, attendance at such
       training would be voluntary, provided the employer does not impose additional requirements
       on the employee, such as taking a particular course.  (*Id*.)

16.    The last paragraph of page 0121 does go on to state that it is a different situation where a
       State requires employers to provide training, but Mrs. Breen made the not unreasonable

---

[5]Defendants also sought to introduce the affidavit of John Rowe, now deceased.   The affidavit was
referenced in the Tenth Circuit opinion as part of the summary judgment evidence.   This court
excluded the affidavit at the post-remand hearing.   The court has considered the deposition of Joni
Fritz (dated August 26, 2008) presented at the hearing.   The parties' objections to specific questions
or answers are overruled.

distinction that Incor is not required to <u>provide</u> training, but rather to use trained staff. (*Id*.)

17. In all their testimony in this case, the court finds Mr. and Mrs. Breen to be witnesses of great credibility.

## CONCLUSIONS OF LAW – LIQUIDATED DAMAGES

1. The court reiterates its conclusion stated at the August 28, 2008 hearing that Incor has met its burden of showing that the Breens exhibited subjective good faith as to the payment of overtime and training time.

2. Incor has also shown to the satisfaction of the court that it had reasonable grounds for believing that its conduct was not a violation of the FLSA. While consulting an attorney or other expert would have made Incor's present position stronger, the issue is obviously fact-intensive and generalizations are hard to draw, even for an attorney. Court decisions have reached different conclusions and remain somewhat unsettled. The "BIOS factors" regarding private home status were not articulated by the Tenth Circuit until 2004, after the litigated events in this case.

3. Similarly, the materials which had been provided to Incor regarding training time were reasonably interpreted by Incor as not requiring the payment of training time hours.

4. Despite these conclusions, the court recognizes its discretion to nevertheless award liquidated damages. The court declines to do so.

## III. "TRAINING TIME" CLAIMS

The Tenth Circuit opinion states: "The employees' third claim was for regular wages for time spent in training classes under the theory that their attendance was involuntary. The FLSA obligates an employer to pay its employees for all hours worked. 'Work' is not defined in the

11

FLSA, but an employee generally must be paid for his time that is controlled and required by the employer regardless of whether it involves any mental or physical exertion.  To that end, the DOL has promulgated regulations regarding training, including 29 C.F.R. §785.27, which provides:

> Attendance at lectures, meetings, training programs and similar activities need not be counted as working time if the following four criteria are met:
> (a) Attendance is outside of the employee's regular working hours;
> (b) Attendance is in fact voluntary;
> (c) The course, lecture, or meeting is not directly related to the employee's job; and
> (d) The employee does not perform any productive work during such attendance.

The regulations further provide that training is not 'voluntary' if an employee's 'attendance . . . is . . . required by the employer.  It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance.'  29 C.F.R. §785.28."   (Tenth Circuit Opinion at 16-17)(citations omitted).  The burden of proving entitlement to the exemption is on Incor.  *Id.* at 17.

## FINDINGS OF FACT – "TRAINING TIME" CLAIMS

1.    Training for Incor employees was mandatory and was scheduled by Incor.  (Tr. 20.12-25).

2.    On occasion, training was scheduled during an employee's regular working hours. (Tr. 72.4-6).

3.    Employees received a notice for training in the envelope containing their paycheck. (Tr.70.21 - 71.20).

4.    If a session was missed, a $25.00 "no show" fee was charged.   If there was a repeated failure to attend a required training, the employee might be removed from the schedule. (Tr.21.1-13).

12

5.    At least some of the training was directly related to an employee's job.  (Tr.50.8-11).

6.    The State of Oklahoma requires training for Incor employees.   (Tr.43.11 - 44.6).  Incor requires no training beyond that required by the State.   (Tr.44.7-10).

7.    Under its contract, if Incor did not use properly trained people, it was subject to losing its contract with the State of Oklahoma.   (Tr.63.10-18); (August 28, 2008 hearing – testimony of Betsy Breen).

## CONCLUSIONS OF LAW – "TRAINING TIME" CLAIMS

1.    The defendants have failed to meet their burden of proving the existence of all four elements listed in 29 C.F.R. §785.27.

2.    There were instances in which training attendance was not outside the employee's regular working hours.   These instances may not have been numerous, but no quantification or specificity was provided in the evidence.  The court does not believe it appropriate, however, to deem the entire amount of training time claimed by plaintiffs to be compensable based solely upon failure to prove this factor.   The amount of time involved is likely *de minimis*.

3.    The evidence also did not establish by the requisite burden of proof that the training course was always not directly related to the employee's job.  The court reiterates that it finds the Breens' position in this regard to be reasonable (for purposes of liquidated damages) because much of the training appears to have been of a general nature and thus served a dual purpose.

4.    Finally, the court finds that defendants have failed to prove the attendance was in fact voluntary.   Again, the Breens were reasonable in their interpretation of the ambiguous seminar materials and DOL opinion letters.   The "Catch-22" structure established by the State (i.e., an agency such as Incor must use trained personnel, but the State does not itself

coordinate the training) leaves the well-intentioned employer evidently liable under 29

C.F.R. §785.28:

> Attendance is not voluntary, of course, if it is required by the employer. It is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance.

Such was the situation in the present case. Incor has a non-frivolous argument that it was the State which actually required attendance and training[6]. Incor, however, imposed sanctions for failing to attend training, thus falling within the provision above[7].

5.      Accordingly, Incor is liable for plaintiffs' "training time" claims.

## FINDINGS OF FACT – "PRIVATE HOME" ISSUE

**505 JUDY LANE**

1.      Clients Sonya Haas, Tamela Lawmaster and Brenda Wilkie lived at 505 Judy Lane, Tahlequah, Oklahoma. The three women are profoundly disabled. (Tr. 907.17-21). They did not live there before receiving services from Incor. (Tr.166.7-10). Incor selected the residence. (Tr.235.21-24).

---

[6]Similarly, the Opinion Letter from the Department of Labor, Wage and Hour Division (Sept. 9, 1996), 1996 WL 1031798, states in part that "where a State requires employers to provide training as a condition of the employer's license to remain open for business . . . [a]s the operator would typically require employees to attend such training, it would not be voluntary, and this criterion would not be met."   Strictly speaking (as Incor argues) the State did not require Incor to provide training, but the court finds Incor was effectively forced to do so and thus the training attendance was not voluntary.

[7]As the Tenth Circuit opinion remanding this case notes, the interpretive regulations and the opinion letter are entitled to deference to the extent they have the power to persuade. *See Skidmore v. Swift & Co.,* 323 U.S. 134 (1944).

2.     Incor is not listed as a lessee on the lease documents.  The lessor is Kathy Morrissey. (Defendants' Exhibit 42, pages 1403-05.)

3.     The residence was considered a "total care" house.  (Tr.247.15-17.)

4.     Regarding Brenda Wilkie for one year at the residence, daily living expenses were $46,044.75, habilitation services were $60,736 and transportation costs were $3,720. (Defendants' Exhibit 42, page1486).  Regarding Sonya Haas for one year at the residence, daily living expenses were $46,170.90 and habilitation services were $51,532.80. (*Id.* at 1540).  Regarding Tamela Lawmaster for one year at the residence, daily living expenses were $46,044.75, habilitation services were $40,934.40 and transportation costs were $7,000. (*Id.* at 1420).

5.     There is a desk at the residence and HTS paperwork may be done where convenient. (Tr.253.2-15).  *See also* Tr.554.5-14; Tr.561.4-9 (local drop-off for time sheets)

6.     At the residence, Incor wrote checks in payment of rent, food, cable television, electricity, water, telephone, sewer, gas, garbage pickup, and other household expenses.   (Plaintiffs' Exhibit 10)

7.     Plaintiffs Wakeetha Atkeson, Bettie Burnett, Katherine Carroll, Lesa Horney, Christine Lane, Joretta Truitt, Deloris Wilson and Frances Woods worked in the residence during the relevant time periods.   (Plaintiffs' Exhibits 77, 79, 80, 85, 86, 91, 99, 108).

## 2200 TURNER

8.     The two clients residing at 2200 Turner, Muskogee, Oklahoma, did not live there before receiving Incor services.  (Tr. 166.11-14).  The lessors were Bill and Pat Perry.  (Plaintiffs' Exhibit 19).  Incor's name appears on the lease as a lessee.  (*Id*). (At the August 28, 2008

hearing, Mrs. Breen testified that she believed the landlord wrote Incor's name and she did not consider Incor obligated as lessee or responsible party, although she conceded the rent check was written on Incor check stock.)  The clients' names were Billy Oman and Leonard Reece.  (Defendants' Exhibit 45; Tr.302.7-9).

9.   The 2200 Turner address was selected by the case management team and the guardian of Mr. Oman.  (Tr. 301.18-24.)

10.  At 2200 Turner, Incor  wrote checks in payment of rent, food, cable television, electricity, garbage pickup, gas, sewer, telephone and other household expenses.   (Plaintiffs' Exhibit 21).

11.  Regarding Billy Oman for one year at the residence, daily living expenses were $46,170.90, habilitation services were $32,793.60, and transportation costs were $4464.00. (Defendants' Exhibit 45, page 0889)(Tr.186.7-10).   Regarding Leonard Reece for one year at the residence, daily living expenses were $46.044.75, habilitation services were $51,392.00, and transportation costs were $3832.50.   (Defendants' Exhibit 45, page 0815)(Tr.186.14-19)

12.  Incor has no possessory interest in the home at 2200 Turner.  (Tr. 302.24 – 303.1.)

13.  Mrs. Breen testified that the two clients would not have to move out if they were no longer receiving Incor's services.   (Tr.302.20-23). (The Tenth Circuit, however, made plain that such non-landlord testimony is speculation.  (Opinion at 10).)

14.  Leonard Reece has an adaptive age of 11 months.  (Defendants' Exhibit 45, page 0826).

15.  Billy Oman has an adaptive age of 11 months.   (Defendants' Exhibit 45, page 0897).

16.  Plaintiffs Ruby McGee, Nicole Pierce, Alice Smith, Lisa Smith Tia Sallis and Kenya Washington worked in the residence.  (Plaintiffs' Exhibits 81, 82, 88, 104).

**810 SHERWOOD**

17.     The residence at 810 Sherwood, Muskogee, Oklahoma, is owned by David Doyle who is not affiliated with Incor.  (Tr. 323.15-20.)

18.     The home at 810 Sherwood was chosen for the clients by their respective guardians.  (Tr. 323.21-23.)

19.     Three clients (Saundra Swindler, Gwen LeFlore and Melanie Yarbrough) lived at the residence.  (Defendants' Exhibit 47, page 2222).   They did not live there prior to receiving Incor services.  (Tr.166.15-18).

20.     At 810 Sherwood, Incor  wrote checks in payment of rent, food, cable television, electricity, garbage pickup, gas, sewer and other household expenses.   (Plaintiffs' Exhibit 31).

21.     Regarding Melanie Yarbrough for one year at the residence, daily living expenses were $46,044.75, habilitation services were $25,600.00 and transportation costs were $6,000. (Defendants' Exhibit 47, page 2242)(Tr.187.21-24).

22.     Regarding Saundra Swindler for one year at the residence, daily living expenses were $46,044.75, habilitation expenses were $74,752.00, and transportation costs were $6,000. (Defendants' Exhibit 47, page 2329)(Tr.190.22-25).

23.     It does not appear any evidence was presented as to client Gwen LeFlore and annual costs.

24.     Mr. Breen testified that the clients at 810 Sherwood would be allowed to live at that address even if they no longer received services from Incor.  (Tr.329.14-17.) Again, however, this constitutes speculation under the Tenth Circuit mandate.

25.     Incor does not reserve any type of office space at 810 Sherwood.  (Tr.329, line 25 – 330.2.)

26.     There is no office or desk at 810 Sherwood.  Incor does not designate where the HTS must complete their paperwork.  (Tr.330.3-9.)

27.     The clients at 810 Sherwood are profoundly disabled.  (Tr.331.12-13.)

28.     Plaintiffs Sherry Sallis and Nicole Pierce worked in the unit.  (Plaintiffs' Exhibits 101 and 104).

## 901 ERIE ST.

29.     Two clients (Robert Harrison and James Duty) lived at 901 Erie, Muskogee, Oklahoma. (Tr.354.22-25 – 355.1-2).

30.     The clients did not live there prior to receiving Incor services.  (Tr.166.19-22).

31.     The residence was leased from Monte Snellgrove, not associated with Incor.  (Tr.358.4 – 359.2).  Incor was listed as a tenant on the lease agreement. (Plaintiffs' Exhibit 14, page 00339). (At the August 28, 2008 hearing, Mrs. Breen testified to the same effect as she did in regard to the lease agreement regarding 2200 Turner.)

32.     At 901 Erie, Incor wrote checks paying for rent, food, electricity, garbage pickup, cable television and other household expenses.  (Plaintiffs' Exhibit 16).

33.     Regarding Robert Harrison for one year at the residence, daily living expenses were $46,170.90, habilitation services were $28,032, job coaching was $9,000 and transportation costs were $3,720.  (Defendants' Exhibit 44, page 0462)(Tr.184.6-10).  Regarding James Duty for one year at the residence, daily living expenses were $46,170.90, habilitation services were $27,212.80, job stabilization was $6,250 and transportation costs were $3100. (Defendants' Exhibit 44, page 0394)(Tr.183.15-19)

18

34.    Plaintiffs Larry Burris, Cody Fowler, Nicole Pierce, Kenya Washington, Lisa Smith and Kent Fowler worked in the residence. [Plaintiffs' Exhibits 73, 74, 75, 81, 88, 104].

## 551 SHERWOOD

35.    Two clients (James Techau and Darryl Brandon) lived at 551 Sherwood (Tr.387.8-10) (Defendants' Exhibit 34). They did not live there prior to receiving services. (Tr.388.8-15).

36.    551 Sherwood is owned by Gary and Carla Dunlop. (Tr.388.2-7.)

37.    No portion of 551 Sherwood is segregated for the business purpose of Incor. (Tr.393.20-25.)

38.    At 551 Sherwood, Incor wrote checks to pay rent, food, electricity, cable television, garbage pickup, gas, sewer and other household expenses. (Plaintiffs' Exhibit 26).

39.    Plaintiffs Ruby McGee, Nicole Pierce and Tia Sallis worked in the residence. (Plaintiffs' Exhibits 96, 100, 104).

## 505 NORTH G STREET

40.    Clients Joe Smith, Christie Ballard and Jamie Breen lived at 505 North G Street in Muskogee, Oklahoma. They did not live there prior to receiving Incor services. (Tr.166.23 – 167.3). Incor is referred to as a tenant in the lease agreement. (Plaintiffs' Exhibit 34, page 01091, ¶23).

41.    The landlords were Roy and Victoria Hawkins. (*Id.* at 01089). Testimony was presented on defendants' behalf that the clients would have been allowed to remain at the residence even without receiving Incor's services. (Tr.430.5-7). Such testimony was, however, speculative and not based upon speaking to the landlords themselves. (Tr.442.17 - 443.6).

42.    The clients were responsible to pay the rent themselves at 505 North G Street. (Tr.429.9-10.) (Mrs. Breen testified to the same effect at the August 28, 2008 hearing).

19

43.   Plaintiffs Wakeetha Atkeson, Larry Burris, Cody Fowler, Kent Fowler, Carmen Kirkland, Angela McVay, Stephanie Newman and Nicole Pierce worked in the residence.  (Plaintiffs' Exhibits 74, 75, 76, 90, 91, 97, 104, 115).

**826 S. YORK, APT. # 1B**

44.   Clients Joe Smith and Christie Ballard leased the property located at 826 S. York, Apt. 1B, in Muskogee, Oklahoma from Sullivan Properties.   (Defendants' Exhibit 35, page 0002.)[8]

45.   Incor is not listed as a lessee on the lease.  (*Id.*)

46.   Smith pays the rent himself. (Tr.414.7-8, 24-25).  Ballard is also responsible for her portion. (Tr.425.3-4).

47.   Neither Smith nor Ballard received the state matching funds.  (Tr.413.7-25;426.3-7)

**826 SOUTH YORK, APT. # 27B**

48.   Client Joe Smith leased the property located at 826 South York, Apt. 27B, from Sullivan Properties d/b/a Southpoint Apartments.  (Defendants' Exhibit 35, page 0001.)

49.   Incor was the payee for Smith's SSI and DI checks.   (Defendants' Exhibit 35, page 0035).

50.   The annual cost document regarding Smith shows daily living expenses of $46,170.90 and transportation costs of $1550, but has no entry for habilitation services.   (Defendants' Exhibit 35, page 0026).

51.   Plaintiffs Roseola Thornburg, Larry Burris, Cody Fowler, Carmen Kirkland, Michael Leach, Stephanie Newman and Kent Fowler worked the York apartments in which the clients resided.  (Plaintiffs' Exhibits 73, 74, 75, 76, 78, 97, 115).

---

[8]The lease actually refers to Apt. #2B (¶2) but this appears to be of no moment.

**919 CHOCTAW**

52.    Client Bobby Creekmore lived at 919 Choctaw in Muskogee, Oklahoma. (Plaintiffs' Exhibit 46, page 01395.).  He did not live at this residence before receiving services from Incor. (Tr.167.4-7).

53.    The landlord, Benny Morgan, has no relationship with Incor.  (Tr.458.16-17).

54.    Evidence was presented that Incor wrote checks paying the rent and other household expenses for this residence.  (Plaintiffs' Exhibit 48).  Testimony was also elicited, however, that Mr. Creekmore was responsible for paying the rent.  (Tr.458.22-24).  The court finds based upon the documentary evidence that Incor made the payments.  The annual cost document reflects daily living expenses of $46,170.90, habilitation services of $56,320, community-based vocational costs of $6,750, center-based vocational costs of #3,000 and transportation costs of $4,185.  (Defendants' Exhibit 46, page 0314)(Tr.187.6-15).

55.    Incor did not reserve space at 919 Choctaw for Incor's business purposes.  (Tr.462.6-8.)

56.    Plaintiffs Larry Burris, Angela Miller, Stephanie Newman and Kenya Washington worked in the residence.  (Plaintiffs' Exhibits 74, 88, 95, 104, 115).

**915 LAKELAND**

57.    Incor client Keith July lived at 915 Lakeland, Checotah, Oklahoma.  The landlord/lessor was Vicki Cooper.  Incor is not listed as a lessee on the lease documents.  The rent was $375.00 per month.  **(**Defendants' Exhibit 36, page 0005**.)**  Mrs. Breen "assume[s]" that Ms. Cooper owns the property.  (Tr.471. 7 - 8).

58.    Annual cost of habilitation services was $74,752.00, daily living $46,044.75 and transportation costs $1160.64. (Defendants' Exhibit 36 at page 0015).

21

59.    Mr. July was already lived at the residence (having received services from another agency)
       when Incor began providing services.  (Tr. 471.13-21).

60.    Incor had no possessory interest in the property.  (Tr.472.5 - 8).

61.    At one point, Mr. July dismissed Incor's services but remained at the residence.  (Tr. 471.22
       - 472.4).  Mrs. Breen is unaware whether the landlord required some provider to be present
       in order for Mr. July to remain.   (Tr.491.7 - 11).

62.    Regarding Keith July for one year at the residence, daily living expenses were $46,044.75,
       habilitation services were $74,752, transportation costs were $5,040, and vocational costs
       were $12,528.  (Defendants' Exhibit 36, page 0015)(Tr.181.5-10).

63.    Mrs. Breen testified that Incor did not segregate any portion of 915 Lakeland for its own use.
       (Tr. 476.25 – 477.15.)  Sonya July testified that there was a designation of a small bedroom
       for paperwork, and she had been directed to purchase a filing cabinet and office supplies.
       Mr. July's medication was also kept there.   (Tr.578.16 - 579.2).

64.    At 915 Lakeland, Incor wrote checks for rent, food, satellite television, electricity, garbage
       pickup, gas, sewer and other household expenses.  (Plaintiffs' Exhibit 39).

65.    Plaintiffs Sonya July, LeCeif Spring and Lajoya Davis worked at the residence.  (Plaintiffs'
       Exhibits 110, 111, 114).

**300 NORTH 40TH**

66.    Client Keith Moore lived at 300 N. 40th.  Mr. Moore lived in that apartment prior to
       receiving Incor services.   (Tr.498.18-20).

67.    The apartment at 300 North 40th Street was leased by the Muskogee Housing Authority,
       which has no affiliation with Incor. (Tr.499.7-17.)

68. The client at 300 North 40th Street pays the rent from his own checkbook. (Tr.500.12-17.) The client at 300 North 40th Street pays his own utilities. (Tr.501.19-20.)

69. There is, however, documentary evidence of state funding. Regarding Keith Moore for one year at the residence, daily living expenses were $46,044.75, habilitation services were $74,752.00 and transportation costs of $12,000. (Defendants' Exhibit 38, page 1138)(Tr.182.7-11).

70. Plaintiffs Cody Fowler, Kent Fowler, Ruby McGee, Michael Leach, Angela Miller, Nicole Pierce, Yolanda White and Cynthia Whitfield worked in the residence. (Plaintiffs' Exhibits 73, 74, 76, 89, 95, 96, 104,106).

**200 E. MONROE**

71. Incor client Joe Smith lived at 200 E. Monroe, Tahlequah, Oklahoma. The lessor was Cherokee Hills Apartments. (Defendants' Exhibit 33, page 0001.)

72. The lease lists "full time provider" as a resident. (*Id.*).

73. Incor did not segregate any portion of 200 E. Monroe D2 for its own business purposes unrelated to the provision of services to client Smith. (Tr.415.14-19.)

74. The apartment at 200 East Monroe is owned by the Cherokee Hills Apartments. (Tr. 411.6-13.)

75. The client at 200 East Monroe is capable of making his own decisions and selected Incor. (Tr.411.16-19.)

76. The client had ultimate management control of the 200 East Monroe, D2 apartment. (Tr.412.3-5.)

77. The apartment was paid for with the client's money. (Tr.412.15-21.)

23

78.     The client at 200 E. Monroe was not part of the Hissom class.  (Tr.413.7-24).

79.     At 200 East Monroe, the client controlled who could enter his apartment, how his home was decorated, and decided when and what to eat.  (Tr.416.22 – 417.4)

80.     Incor had no possessory interest in the 200 East Monroe, D2 apartment.  (Tr.422.13-14.)

**925 CALLIE**

81.     At trial, the parties agreed that no overtime was registered at 925 Callie during the applicable period.  (Tr.512.21 – 513.6.)  Therefore the Court received no evidence concerning the private home status of 925 Callie.

**321 NORTH 15TH**

82.     Three clients lived at 321 North 15th, Muskogee, Oklahoma :  Christie Ballard, Rhonda Capps and Tiffany Thomas.  (Tr.515.11-23.)  They did not live there prior to receiving services from defendants.   (Tr.167.20-23).

83.     321 North 15th was leased from Lester Beasley.  (Tr.519.5-9.)

84.     Mr. Beasley has no affiliation with Incor.  (Tr.519.10-12.)

85.     The clients were in control of 321 North 15th Street.  (Tr.519.23-24.)

86.     Incor does not reserve any part of 321 North 15th for Incor's use.  (Trial Transcript,  page 521.2-4.)

87.     Plaintiffs Wakeetha Atkeson and Angela McVay worked at the address. (Plaintiffs' Exhibits 90 & 91).

<u>**CONCLUSIONS OF LAW – "PRIVATE HOME" ISSUE**</u>

1.      In determining whether companionship services are provided in a private home, the object of the evaluation is the living unit of the person receiving the services, i.e., the client.  The

client's living unit consists of the client's bedroom and the common areas to which the client has access.  (Tenth Circuit Opinion at 6-7).

2.    Incor bears the burden of proving that these are private homes by a preponderance of the evidence.  (*Id.* at 12).  The court must evaluate each living unit separately.  (*Id.* at 7).

3.    The key inquiries to determine whether the living unit is a private home are who has ultimate management control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services.  (*Id.*)

4.    There are several factors used to answer these key inquiries, including: (1) did the client live in the living unit as his or her private home before receiving services; (2) who owns the living unit; (3) who manages and maintains the residence; (4) would the client be allowed to live in the living unit if he or she was not receiving services; (5) the relative difference in the cost/value of the services provided and the total cost of maintaining the living unit; and (6) whether the service provider uses any part of the living unit for its own business purposes.  (*Id.*).

**505 JUDY LANE**

5.    Regarding the first two *Welding* factors, the court has found the client(s) did not live in the living unit as her private home before receiving services, and that the living unit is owned by a third party.

6.    Turning to the third factor, the court concludes that it is Incor which manages and maintains the residence.   As reflected in the check ledger, Incor provides many of the essentials of daily living for the clients.  In turn, this weakens the force of the court's conclusion as to the second factor (i.e., the client made their marks on the lease, which is some indication it is

a private home), the Tenth Circuit Opinion notes that residences managed by HTSs do not fit plainly and unmistakably into the ordinary connotation of the words "private home" notwithstanding the fact that the lease may bear the name of a developmentally disabled person.  (*Id.* at 9).

7.  No pertinent evidence (e.g., testimony of the landlord) was presented on the fourth factor, whether the client would be allowed to live in the unit if the client were not contracting with the provider for services.

8.  The factual findings as to each of the three clients lead the court to conclude that the cost/value of the services is a substantial portion of the total cost of maintaining the living unit, a conclusion which weighs in favor of it not being a private home.  Indeed, as to clients Wilkie and Haas, the cost of the habilitation services exceeds the annual amount for daily living expenses.

9.  Finally, defendants failed to prove that Incor did not use any part of the residence for its own business purposes, thus failing to meet its burden as to the sixth factor.   The list of factors in *Welding* is not exhaustive.   *See* 353 F.3d at 1220.  The parties, however, have pointed to no other applicable factor which they wish the court to consider.

10.  No single *Welding* factor is dispositive.  *Id.* at 1218.  Considering all factors in light of the conclusions above, the court concludes that defendants have failed in their burden of proof as to 505 Judy Lane.   Accordingly, the court concludes it was <u>not</u> a private home.

**2200 TURNER**

11.  The court has again found that the clients did not live in the living unit prior to receiving services.  As to the second factor, while the living unit is owned by a third party, Incor's

name appears on the lease, producing even weaker force in the defendants' favor than as to 505 Judy Lane.

12.    Viewing the third factor, the court finds that Incor managed and maintained the residence as the provider of essential things that the client needs to live there.

13.    Again, no pertinent evidence was presented as to the fourth factor.

14.    The court concludes, based on the factual findings as to this living unit, that the cost/value of the services was a substantial portion of the total cost of maintaining the living unit.

15.    In the absence of a factual finding, the court renders no conclusion as to the sixth factor.

16.    The court concludes that defendants have failed to meet their burden of proof as to 2200 Turner Street, and the court accordingly concludes it was not a private home.

**810 SHERWOOD**

17.    After considering the factual findings as to this residence, the court's conclusions as to the first five factors for this living unit are the same as those regarding 2200 Turner, with the exception that Incor's name does not appear on the lease for 810 Sherwood.

18.    As to the sixth factor, the court concludes that no part of the living unit was used for the provider's business purposes.

19.    Nevertheless, considering the factors as a whole, the court concludes that defendants failed to meet their burden of proof and thus 810 Sherwood was not a private home.

**901 ERIE**

20.    In view of the factual findings as to this residence, the court concludes that the clients did not live at the living unit prior to services, and that (although a third party owned the residence) the force of this factor is weak because Incor's name again appears on the lease.

21.     The court concludes as to the third factor that Incor managed and maintained the residence.

22.     Once more, no pertinent evidence was presented as to the fourth factor and as to the fifth factor the court concludes that the cost/value of the services is a substantial portion of the total cost of maintaining the living unit.

23.     The court renders no finding as to the sixth factor in the absence of evidence.

24.     Considering the factors as a whole, the court concludes that defendants have failed in their burden of proof.  The court concludes that 901 Erie was not a private home.

## 551 SHERWOOD

25.     Little evidence was presented as to some of the factors regarding this residence.   Inasmuch as defendants bear the burden of proof, of course, such lack of evidence is not to their benefit.

26.     Based upon the first factor and the third factor (evidence was presented that Incor manages and maintains the residence) the court concludes after considering the factors as a whole that 551 Sherwood was not a private home.

## 505 NORTH G STREET

27.     Again, little or not evidence was presented as to some factors.  Conclusions in favor of plaintiffs as to this residence are that the clients did not live there prior to receiving services and that Incor's name appears on the lease.

28.     While there was testimony that the clients paid their own rent, there was also considerable state billing.  (*See* Plaintiffs' Exhibit 36).

29.     While this is the closest call so far, the court concludes defendants have again failed in their burden of proof and that 505 North G Street was not a private home.

28

**826 YORK, APT. 27B**

30.    Evidence presented pertinent to the *Welding* factors was skimpy as to this residence.  Under

those circumstances, the court must find that defendants have failed in their burden of proof

and this residence also was <u>not</u> a private home.

**919 CHOCTAW**

31.    Based upon the factual findings for this residence, the first factor is resolved in plaintiffs'

favor and the second factor is resolved in defendants' favor.

32.    The third and fifth factors are strongly resolved in plaintiffs' favor, and these conclusions

overwhelm the finding in defendants' favor on the sixth factor.

33.    Viewing the factors as a whole, the court concludes defendants have failed to meet their

burden of proof and the residence was <u>not</u> a private home.

**915 LAKELAND**

34.    The client lived at the residence prior to receiving services.  Accordingly, the first as well

as the second factor are resolved in defendants' favor.

35.    The third and fifth factor are, however, strongly resolved in plaintiffs' favor.

36.    No conclusion will be stated as to the sixth factor, in that no evidence was presented.

37.    Considering the factors as a whole, the court concludes that defendants have failed to meet

their burden of proof and the residence was <u>not</u> a private home.

**300 N. 40TH STREET**

38.    The first and second factors are resolved in favor of defendants.  That is, the client lived at

the residence before receiving services and the owner was a third party.

39.    As to the remaining factors, defendants did not meet their burden of proof.  The court

concludes this was <u>not</u> a private home.

**200 E. MONROE**

40.     Incor's name appears on the lease, thus failing the second factor.

41.     No evidence was presented as to many other factors.   The court thus finds defendants failed
        to meet their burden of proof and the residence was <u>not</u> a private home.

**321 NORTH 15TH**

42.     Viewing the factors as a whole, the court finds defendants `have failed in their burden of
        proof and the residence was <u>not</u> a private home.

**20% RULE FOR ALL DWELLING UNITS**
<u>**DETERMINED TO BE PRIVATE HOUSES**</u>

Because the court has found that none of the residences which were the subject of evidence
at trial constitute a private home, plaintiffs are entitled to overtime pay under the FLSA.   In the
event the court is erroneous as to one or more residence in this regard, however, the court will make
findings of fact as to the "20% rule" as well.

The plaintiffs' claim is "based on the theory that even if they were working in private homes,
they spent more than twenty percent of the total hours worked each week performing general
household tasks."   (Tenth Circuit Opinion at 13).   "Section 552.6 distinguishes household work
related to the care of a client, which includes meal preparation, bed making, laundry, and other
similar services, from general household work, which is unrelated to the care of the client."   *Id.*
"Incor bears the burden of proving its entitlement to this exemption under a remedial statute that
must be narrowly construed."   *Id.* at 14.   Thus, the defendants face the daunting task of proving that
an employee did <u>not</u> spend more than twenty percent of the total hours worked on general household
tasks.   In view of the fact that the only evidence presented as to quantity of hours was the plaintiffs'

30

own testimony, the court finds defendants failed to meet their burden of proof in regard to any individual plaintiff.[9]

## FACTS COMMON TO ALL PLAINTIFFS

1.     Such work as mopping, vacuuming, and general cleaning was the ultimate responsibility of the HTS.  (Tr.95.18 - 96.17).

2.     If the client was unable to complete a task or too disabled to do so, completion was up to the HTS.  (Tr.201.2-13).

3.     Doing all the household work, however, is not in compliance with the HTS job description. (Tr.201.20 – 202.14; 203.3-5)

4.     The standard is to assist the client in keeping the home in the same state of cleanliness as any other individual's home.  (Tr.394.16-18.)

5.     The paperwork and notebooks that record the client's daily activities are required by the Department of Human Services.  (Tr.641.17-22.)

## FACTS RELATING TO CLAIMS BY SPECIFIC PLAINTIFFS[10]

## MICHAEL LEACH

6.     Plaintiff Leach testified that he was responsible for vacuuming and mopping.  (Tr.612.14-17).  Work to make the house "presentable" might take up a majority of his time on a

---

[9]In the court's previous Findings of Fact and Conclusions of Law, the court made credibility findings (some of them severe) as to plaintiffs on this issue.  With the issue clarified that the burden of proof is on defendants as to the 20% issue, a determination of credibility short of perjury appears unnecessary, so long as a minimal burden of production is met.

[10]A statement of death as to plaintiffs Bruce McCarthy and Roseola Thornburg was filed on January 22, 2009 [Docket No. 462].  It appears both plaintiffs died while the case was on appeal, not while awaiting this court's post-remand decision.

particular day.  (Tr.613.15-20).  Thus 25% of his time could be spent doing paperwork.  (Tr.617.7-12; 647.4-5).

**CODY FOWLER**

7.      Plaintiff Cody Fowler testified he spent 50% or more of his time doing general household work.  (Tr.658.17-25).  He often spent four hours per sixteen hour shift completing and reviewing the required paperwork.  (Tr.663.18-22).

**BRUCE McCARTHY**

8.      Plaintiff McCarthy spent a substantial portion, and sometimes all, of his shift on general household work.  (Tr.693.25 - 694.11).  Another substantial portion of his time was spent on the required paperwork.  (Tr.695.3-11).

**ANNTONNETT TAYLOR**

9.      Plaintiff Taylor spent 20% of her time cleaning.  (Tr.714.5-7).  On a shift she spent 30-45 minutes on paperwork.  (Tr.714.8-10).  She also worked for the client's mother (who was not an Incor client) pursuant to defendants' instructions.   (Tr.713.23 - 714.2-4; 714.11 - 715.14).

**JUDY BLACKMER**

10.     Plaintiff Blackmer spent roughly thirty percent of her time doing general housework.  (Tr.729.12-14).   She also spent roughly twenty percent of her time doing the required paperwork.  (Tr.729.15-17).  She was also requested to accommodate the client's mother.  (Tr.727.23 - 728.13).

**STEPHANIE NEWMAN**

11.     Plaintiff Newman spent 20% to 30% of her time cleaning.  (Tr.747.10-12).  She spent 30

minutes to an hour per shift on the required paperwork.  (Tr.747.13-16).

**ROSEOLA THORNBURG**

12.     Plaintiff Thornburg spent about 20% of her time cleaning.  (Tr.764.16-18).  As an HTS, she

spent about 25% of her time doing the required paperwork.  (Tr.764.19-23).  As a House

Manager, she spent about half her time doing the required paperwork.  (Tr.765.24 - 766.3).

**CHRISTINE LANE-HUCKABAY**

13.     Plaintiff Lane-Huckabay spent between 20% to 40% of her shift in general household tasks.

(Tr.780.6-11).  She spent roughly 10% of her day completing the required paperwork.

(Tr.780.16-18).

**YOLANDA WHITE**

14.     Plaintiff White spent approximately 30 minutes per shift doing cleaning. (Tr.792.4-13).  She

spent about two hours per shift on the required paperwork.  (Tr.796.11-15).

**LARRY BURRIS**

15.     Plaintiff Burris spent about an hour per day on general household cleaning at the York

Apartments address. (Tr.812.2-4).  He spent 30-45 minutes per night shift on the paperwork.

(Tr.812.7-9).  At the 901 Erie residence, he spent the day from approximately 8:30 a.m. to

2:00 p.m. on general household tasks and the required paperwork.  (Tr.815.5-10).

**SONJA JULY**

16.    Plaintiff July spent approximately 25% of her time cleaning.  (Tr.827.11-19).  As an HTS, she spent an hour to two hours per shift on the required paperwork.  (Tr.830.1-7).  As a House Manager, her paperwork requirements increased 30 to 40 percent.  (Tr.832.3-9).

**KATHERINE CARROLL**

17.    Plaintiff Carroll spent between 10 percent to 25 percent of her time doing household cleaning.  (Tr.849.23 - 850.3).  She also had paperwork responsibilities which took 10 percent to 15 percent of her time as an HTS.  She used another ten percent of her time on the paperwork required of her as House Manager.  (Tr.853.16 - 854.5).

**BETTIE BURNETT**

18.    Plaintiff Burnett during a day shift would spend an hour to an hour and a half in general household work.  During the night shifts, the amount of time was three to four hours.  (It should be noted the question also encompassed meal preparation, which constitutes household work related to the care of the client under Section 552.6).  (Tr.873.24 - 874.21).  She also spent 15 to 20 minutes per 8-hour shift on the required paperwork.  (Tr.872.1-8).

**CARMEN KIRKLAND**

19.    Plaintiff Kirkland spent two hours per shift doing general household work.  (Tr.886.7-14).  On a "smooth" night (i.e., one without incident reports) she worked an hour and a half on the required paperwork.   (Tr.888.7-11).

**ANGELA MILLER**

20.     Plaintiff Miller spent "no more than three hours" of her shift doing general household work. (Tr.898.20-22).  She also spent an hour and a half on required paperwork. (Tr.899.25 - 900.1).

**JORETTA TRUITT**

21.     Plaintiff Truitt spent seventy percent of her time doing general household work. (Tr.907.22 - 910.3).  She spent twenty to thirty-five minutes completing the required paperwork. (Tr.912.20 - 913.3).

**ANGELA MCVAY**

22.     Plaintiff McVay periodically throughout her overnight shift did general household work and the required paperwork.  (Tr.919.1 - 920.15).

**ALICE SMITH**

23.     Plaintiff Alice Smith equally divided her time between (1) general household work and paperwork and (2) the client.  (Tr.953.16-22).

**RUBY MCGEE**

24.     Plaintiff McGee spent about half her time doing general household work and the other half interacting with the clients.  (Tr.965.11 - 966.18).

**LECEIF SPRING**

25.     Plaintiff Spring spent 25% to 30% of his time doing general household work. (Tr.972.12-13).  He spent approximately thirty minutes per shift on the required paperwork. (Tr.974.12-16).

**WAKEETHA ATKESON**

26.    Plaintiff Atkeson spent most of her shift doing general household work.  (Tr.989.18-21).
       About an hour was spent on the required paperwork.  (Tr.989.22 - 990.1).

**DELORIS WILSON**

27.    Plaintiff Wilson spent most of her shift completing general household work and paperwork.
       (Tr.1004.14 - 1005.20).

**KENYA WASHINGTON**

28.    Plaintiff Washington spent one to one and a half hours of her shift doing general household
       work.  (Tr.1022.21-23).  She spent 45 minutes per client on the required paperwork.
       (Tr.1024.6 - 10).

**CYNTHIA WHITFIELD**

29.    Plaintiff Whitfield spent fifty percent to sixty percent of her time doing general household
       work.  (Tr.1038.20 - 1039.1).  She spend time throughout her shift doing the required
       paperwork.  (Tr.1040.22 - 1041.5).

**LISA SMITH**

30.    Plaintiff Lisa Smith rotated her shift between the clients, general household work and
       paperwork.  (Tr.1057.10 -1059.1).  As House Manager, additional time was spent on the
       duties of staffing and paperwork.  (Tr.1059.7 - 1062.10).

**LESA HORNEY**

31.    Plaintiff Horney spent approximately one hour to three hours during the evening shift doing
       general household work.  (Tr.1085.7 - 1088.5).  She spent thirty to forty-five minutes on
       paperwork.  (Tr.1088.6 - 1089.3).  Her duties as a House Manager took an additional three

hours.  (Tr.1093.25 - 1094.7).

**NICOLE PIERCE**

32.     Plaintiff Pierce spent 30% to 35% of her time doing general household work.  (Tr.1116.24 -
        1117.6).  She spent 20% of her time doing the required paperwork.  (Tr.1114.1 -14).

**FRANCES WOOD**

33.     Plaintiff Wood spent two hours of her shift doing general household work.  (Tr.1129.13 -
        25).  She also spent an additional 30-40 minutes per shift on HTS paperwork.  (Tr.1130.3-5).
        An extra hour per shift was used for House Manager duties.  (Tr.1130.6 -21).

**SHERRY SALLIS**

34.     The deposition of Plaintiff, Sherry Sallis, taken on April 1, 2004, was admitted into evidence
        based on Ms. Sallis' unavailability to testify live at the time of trial.  Based upon this Court's
        review of Ms. Sallis' deposition, this Court finds the following facts:

35.     Plaintiff Sherry Sallis was employed at Incor beginning December 11, 1996 and worked up
        until August 7, 2002, when she went on medical leave.  (Deposition, page 12, lines 9-20.)

36.     During Plaintiff Sallis' employment at Incor, she was always an HTS.  (Deposition, page 13,
        lines 19-21.)

37.     With the exception of one shift, Plaintiff Sallis worked as an HTS at 704 Foltz Lane and 810
        Sherwood.  (Deposition, page 14, lines 5-12.)

38.     The clients with which Plaintiff Sallis worked were non-verbal and required a great deal of
        care.  (Deposition, page 16, lines 11-13; page 16, line 23 – page 17, line 24.)

39.     The training time that Plaintiff Sallis is claiming was for courses required for her
        employment.  (Deposition, page 25, lines 8-10.)

40.   Plaintiff Sallis spent approximately 15 to 30 minutes cleaning the house per day. (Deposition, page 44, line 20 – page 45, line 6.)

**KENT FOWLER**

41.   Plaintiff Kent Fowler, while an HTS and a House Manager, spent 40% of his time doing general household work.  (Tr.1141.7-9).  He spent an hour to an hour and a half per day on the required paperwork.  (Tr.1141.17-24).

## <u>FINDINGS AS TO DAMAGES</u>

1.   Plaintiff Kent Fowler is owed $2,868.52 for 783.75 hours overtime as an HTS from 6/03/01 to 6/03/03. He is also owed $4,327.20 for 720 hours overtime as a Program Coordinator from 6/03/01 to 6/03/03. He is owed $534.06 for time spent in mandatory training. [Plaintiffs' Exhibit 203; Plaintiffs' Exhibit 3, 160]

2.   Plaintiff Frances Woods is owed $7,735.03 for 1997.68 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $136.00 for time spent in mandatory training from September 4, 2001 to June 7, 2003. She is also owed $4,755.58 for 1207 hours of overtime worked between September 4, 2003 through September 18, 2004 and an additional $63.04 for training attended between September 4, 2003 through September 18, 2004. [Plaintiffs' Exhibits 77, 164, and 203]

3.   Plaintiff Lesa Horney is owed $2,723.01 for 713.05 hours of overtime from October·10, 2001 to June 7, 2003. She is also owed $416.73 for time spent in mandatory training from October 10, 2001 to June 7, 2003. She is also owed $1,908.81 for 501 hours of overtime worked between October 10, 2003 through September 11, 2004 and an additional $60.96 for training attended between October 10, 2003 through September 11, 2004. [Plaintiffs'

Exhibits 85, 172, and 203]

4.     Plaintiff Bettie Burnett is owed $5,362.63 for 1469.08 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $344.88 for time spent in mandatory training· from September 4, 2001 to June 7, 2003. She is also owed $2,825.10 for 774 hours of overtime worked between September 4, 2003 through September 18, 2004 and an additional $58.40 for training attended between September 4, 2003 through September 18, 2004. [Plaintiffs' Exhibits 80, 167, and 203]

5.     Plaintiff Wakeetha Atkeson is owed $2,298.55 for 624.88 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $397.02 for time spent in mandatory training from October 3, 2001 to June 7, 2003. She is also owed $1,466.48 for 398.5 hours of overtime worked between October 10, 2003 through September 18, 2004 and an additional $58.88 for training attended between October 10, 2003 through September 18, 2004. [Plaintiffs' Exhibits 91, 178, and 203]

6.     Plaintiff Joretta Truitt is owed $311.08  for 87.10 hours of overtime from October 20, 2001 to June 7, 2003. She is also owed $165.76 for time spent in mandatory training from October  20, 2001 to June 7, 2003.  She is also owed $37.48 for 10.5 hours of overtime worked between October 20, 2003 through October 26, 2003. [Plaintiffs' Exhibits 108, 192, and 203]

7.     Plaintiff Katherine Carroll is owed $2,500.64 for 582.28 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $172.40 for time spent in mandatory training from September 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 79, 166, and 203]

8.     Plaintiff Christine Lane is owed $634.28 for 105.75 hours of overtime from October 3, 2001

to June 7, 2003. She is also owed $165.92 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 86, 173, and 203]

9.     Plaintiff Yolanda White is owed  $973.75 for 268.25 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $58.00 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 89, 176, and 203]

10.    Plaintiff Sherry Sallis is owed $65.37 for 18 hours of overtime from October 20, 2001 to June 7, 2003. She is also owed $146.44 for time spent in training from October 20, 2001 to June 7, 2003. [Plaintiffs' Exhibits 101, 186, and 203]

11.    Plaintiff Nicole Pierce is owed $1,412.37 for 410.8 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed $283.64 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 104, 189, and 203]

12.    Plaintiff Angela McVay is owed $36.63 for 11.5 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $560.56 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 90, 177, and 203]

13.    Plaintiff Angela Miller is owed $706.05 for 191.60 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $23.95 for time spent in mandatory training from October 3, 2001 to June 7, 2003. She is also owed $947.40 for 256.75 hours of overtime worked between October 10, 2003 through August 14, 2004. [Plaintiffs' Exhibits 95, 180, and 203]

14.    Plaintiff Stephanie Newman is owed $1,681.86 for 508.53 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed 644.13 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 115, 199, and 203]

40

15.     Plaintiff Kenya Washington is owed $845.08 for 263.27 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $200.00 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 88, 175, and 203]

16.     Plaintiff Ruby McGee is owed $97.65 for 27.90 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $238.00 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 96, 181, and 203]

17.     Plaintiff Larry Burris is owed $1,082.89 for 295.62 hours of overtime from June 4, 2001 to June 7, 2003. He is also owed $580.76 for time spent in mandatory training from June 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 75, 162, and 203]

18.     Plaintiff Carmen Kirkland is owed $221.94 for 67.05 hours of overtime from October 3, 2001 to June 7, 2003. She is also owed $76.13 for time spent in mandatory training from October 3, 2001 to June 7, 2003. [Plaintiffs' Exhibits 97, 182, and 203]

19.     Plaintiff Roseola Thornburg is owed $220.88 for 57 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $62.00 for time spent in mandatory training from September 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 78, 165, and 203]

20.     Plaintiff Lisa Smith is owed $240.80 for 43 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $67.20 for time spent in mandatory training from September 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 81, 168, and 203]

21.     Plaintiff Alice Smith is owed $245.31 for 78.5 hours of overtime from September 4, 2001 to June 7, 2003. She is also owed $200.00 for time spent in mandatory training from September 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 82, 169, and 203]

22.     Plaintiff LaToya Davis is owed $56.80 for time spent in mandatory training from

October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 110, 194, and 203]

23.     Plaintiff Sonya July is owed $173.41 for 42.82 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed $60.75 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 114, 197, and 203]

24.     Plaintiff LeCeif Spring is owed $105.30 for 32.40 hours of overtime from October 10, 2001 to June 7, 2003. He is also owed $108.00 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 111, 195 and 203]

25.     Plaintiff Cynthia Whitfield is owed $887.98 for 249.43 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed $259.88 for time spent in mandatory training from October 10, 2001 to June 7, 2003. She is also owed $28.48 for 8 hours of overtime worked between October 10, 2003 through September 20, 2003. [Plaintiffs' Exhibits 106, 190, and 203]

26.     Plaintiff Deloris Wilson is owed $165.15 for 51.63 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed $400.00 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 99, 184, and 203]

27.     Plaintiff Anntonnett Taylor is owed $250.02 for 78.5 hours of overtime from October 3, 2001 to June 7, 2003.  She is also owed $50.96 for time spent in mandatory training from October 3, 2001 to June 7, 2003 [Plaintiffs' Exhibits 98, 183, and 203]

28.     Plaintiff Judy Blackmer is owed $873.50 for 231.83 hours of overtime from October 10, 2001 to June 7, 2003. She is also owed $120.99 for time spent in mandatory training from October  10, 2001 to June 7, 2003. She is also owed $380.77 for 101 hours of overtime worked between October 10, 2003 through November 15, 2003. [Plaintiffs' Exhibits 109,

193, and 203]

29.   Plaintiff Michael Leach is owed $3,924.73 for 1073.47 hours of overtime from September 4, 2001 to June 7, 2003. He is also owed $145.00 for time spent in mandatory training from September 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 76, 163, and 203]

30.   Plaintiff Bruce McCarthy is owed $3,412.95 for 1004.58 hours of overtime from October 10, 2001 to June 7, 2003. He is also owed $117.92 for time spent in mandatory training from October 10, 2001 to June 7, 2003. [Plaintiffs' Exhibits 103, 188, and 203]

31.   Plaintiff Cody Fowler is owed $1,359.94 for 426.98 hours of overtime from June 4, 2001 to June 7, 2003. He is also owed $429.98 for time spent in mandatory training from June 4, 2001 to June 7, 2003. [Plaintiffs' Exhibits 74, 161, and 203]

32.   Plaintiff Tia Sallis is owed $233.60 for time spent in mandatory training. [Plaintiffs' Exhibits 100, 185, and 203]

Each Plaintiff is awarded judgment for training time and overtime pay as set forth above.

In the absence of liquidated damages, in the court's discretion plaintiffs are entitled to recover prejudgment interest. See Ford v. Alfaro, 785 F.2d 835, 842 (9th Cir.1986); See also Pabst, 228 F.3d at 1136 (prejudgment interest is ordinarily awarded in federal cases). A federal rate of interest applies since the cause of action arises out of federal law. Guides, Ltd. v. Yarmouth Group Property Management, Inc., 295 F.3d 1065, 1077 (10th Cir.2002). Prejudgment interest shall accrue from the date of the loss. Cf. id. at 1078.

Based upon the above Findings of Fact and Conclusions of Law, the court hereby rules in favor of Defendants and against Plaintiffs as to Plaintiffs' claim for liquidated damages. The court rules in favor of Plaintiffs and against Defendants as to all other claims remaining after remand.

The request of Plaintiffs for status conference [Docket No. 461] is DENIED.

Dated this 12th day of February, 2009.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

**Dated this 12th Day of February 2009.**

J4h4i0

44